**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

JANICE NUÑEZ,

            **Plaintiff,**

vs.                                                    No.  03cv0303  DJS

JO ANNE B. BARNHART,
**COMMISSIONER OF SOCIAL SECURITY,**

            **Defendant.**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's (Nuñez') Motion to Reverse or Remand Administrative Decision **[Doc. No. 7]**, filed July 18, 2003, and fully briefed on October 14, 2003. The Commissioner of Social Security issued a final decision denying Nuñez' claim for disability insurance benefits and supplemental security income benefits.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to reverse is well taken and will be GRANTED.

### I.  Factual and Procedural Background

Nuñez, now 46 years old, filed her application for disability insurance benefits and supplemental security income on November 3, 2000, alleging disability since April 8, 1998, due to head, neck, back, left shoulder and left arm injuries.  Tr. 23.  Nuñez has a high school education and past relevant work as a house manager and direct care worker for developmentally disabled adults.  *Id.*  On April 23,  2002, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding that Nuñez' impairments of impingement syndrome of her left shoulder status

post decompression, left shoulder tendonitis, and cervical sprain/strain were severe but did not

meet or equal in severity any of the disorders described in the Listing of Impairments, Subpart P,

Appendix 1, Regulations No. 4.  Tr. 27.  The ALJ also found Nuñez' dysthymia was not a severe

impairment.  *Id.*  Specifically, the ALJ reviewed Listings 1.02 (Major dysfunction of a joint),

1.07(Fracture of an upper extremity) and 12.04 (Affective Disorders).  Tr. 27, 28.  The ALJ

further found Nuñez retained the residual functional capacity (RFC) "to perform sedentary to light

exertional level work, which requires lifting or carrying no more than 10 lbs., standing or walking

nor more than 6 hours total in an 8 hour workday, sitting no more than 6 hours total in an 8 hour

workday, and no repetitive overhead reaching."  Tr. 28.  As to her credibility, the ALJ found

Nuñez' "testimony as to the extent, intensity, and duration of subjective symptoms and resulting

limitations is credible only to the extent that she is limited to sedentary to light exertional level

work . . . ."  Tr. 32.  Nuñez filed a Request for Review of the decision by the Appeals Council.

On February 5, 2003, the Appeals Council denied Nuñez' request for review of the ALJ's

decision.  Hence, the decision of the ALJ became the final decision of the Commissioner for

judicial review purposes.  Nuñez seeks judicial review of the Commissioner's final decision

pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether he applied correct legal standards.

*Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395

(10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications.  20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

3

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Nuñez makes the following arguments: (1) the ALJ's RFC determination is contrary to the evidence and the law; (2) the ALJ's finding that her mental impairment was not severe is contrary to the law and the evidence; and (3) the ALJ's reliance on the Medical-Vocational Guidelines (the grids) was contrary to the law.

**A.  RFC Determination**

Residual functional capacity is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs."  20 C.F.R. pt. 404, subpt. P, app. 2, § 2000.00(c)(emphasis added).  In determining a claimant's physical abilities, the ALJ must "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis."  20 C.F.R. § 404.1545(b).

In determining a claimant's mental RFC, the ALJ "must follow the procedure for evaluating mental impairments set forth in 20 C.F.R. § 404.1520a and the Listing of Impairments and document the procedure accordingly."  *Cruse v. United States Dep't of Health & Human*

*Servs.*, 49 F.3d 614, 617 (10th Cir. 1995), *see also Winfrey v. Chater*, 92 F.3d 1017, 1024 (10th Cir. 1996).  The ALJ documents the procedure by completing a PRT form, which the ALJ must attach to his written decision.  "[T]he record must contain substantial competent evidence to support the conclusions reached on the PRT form [, and] if the ALJ prepares the form himself, he must 'discuss in his opinion the evidence he considered in reaching the conclusions expressed on the form.'"  *Winfrey*, 92 F.3d at 1024 (quoting *Cruse*, 49 F.3d at 617-18).

In this case, the ALJ found that, although, Nuñez "may experience occasional feelings of depression and anxiety," these impairments did "not rise to the level of a severe impairment."  Tr. 26.  The Court will address this issue further under claimant's argument that the ALJ erred in finding her mental impairment not severe.

As to her physical abilities, Nuñez contends the ALJ's RFC determination is contrary to the evidence and the law for the following reasons: (1) the RFC finding is contrary to her treating physician's opinion; and (2) the RFC finding is contrary to the agency consultant's opinion.

A treating physician may offer an opinion about a claimant's condition and about the nature and severity of any impairments.  *Castellano v. Secretary of Health and Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).  The regulations provide that the agency generally will give more weight to medical opinions from treating sources than those from non-treating sources and that the agency will give controlling weight to the medical opinion of a treating source if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  20 C.F.R. § 404.1527(d)(2).

Unless good cause is shown to the contrary, the Commissioner must give substantial weight to the testimony of the claimant's treating physician.  If the opinion of the claimant's

physician is to be disregarded, specific legitimate reasons for this action must be set forth.  *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984).  "'In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion.'"  *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002)(quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)).  An ALJ may not substitute his own opinion for a medical opinion.  *See Sisco,* 10 F.3d  at 744.  However, a treating physician's opinion that a claimant is totally disabled is not dispositive "because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]."  *Castellano,* 26 F.3d at 1029.

Nuñez contends the ALJ's RFC finding is contrary to her treating physician's opinion.  Dr. Jonathan Burg, a specialist in Physical Medicine and Rehabilitation, first examined Nuñez on April 23, 1999.  Tr. 200.  At that time, Nuñez had been treated for cervical sprain/strain with medial scapular sprain as a result of a work injury that occurred on November 7, 1997.  She had received trigger point therapy and injections but continued to complain "of a pulling sensation along the left trapezius and scalenes and into her left shoulder."  *Id.*  Dr. Burg performed a physical examination and found "some tender trigger points along the left scalene." *Id.*  Reflexes, strength, and sensation were full on the left, with mild to moderate impingement in the left shoulder with abduction and internal rotation.  Her neck range of motion was slightly decreased.  Dr. Burg assessed Nuñez as having suffered a sprain/strain to the shoulder tendons with a chronic shoulder tendonitis on the left.  Tr. 201.  Dr. Burg did not feel an MRI was necessary.  Dr. Burg

administered an injection into the left subacromial bursa consisting of Kenalog and procaine with immediate relief. *Id.*

On May 6, 1998, Nuñez returned to see Dr. Burg. Tr. 199. Nuñez reported her left shoulder pain returned two days after she received the injection. Dr. Burg assessed her as having "impingement syndrome." The physical examination revealed "a painful arc of abduction at about 90 degrees" and pain with internal rotation at about T10. *Id.* Dr. Burg ordered an MRI.

On June 5, 1998, Dr. Edwin L. Kennedy was covering for Dr. Burg and reviewed the MRI results with Nuñez. Tr. 197. The MRI revealed a "proximal supraspinatus tendonitis" which Dr. Burg found compatible with impingement. Nuñez continued to complain of left sided neck and shoulder pain. Dr. Kennedy's physical examination revealed a pinching in the left shoulder at abduction of 90 degrees actively and marked tenderness in the cervicodorsal region on palpation in the left parascapular area. *Id.* Dr. Kennedy assessed Nuñez as suffering from cervicodorsal myofascial pain and left shoulder impingement with supraspinatus tendonitis. Dr. Kennedy recommended a surgical evaluation of the left shoulder, opining Nuñez could benefit from a subacromial decompression.

On July 20, 1998, Dr. Burg evaluated Nuñez. Tr. 196. Dr. Wascher, a surgeon, had evaluated Nuñez and opined she had impingement based on the MRI and would be a surgical candidate after more physical therapy. Dr. Burg reviewed Nuñez' records and opined that physical therapy had not helped in the past and recommended she return to Dr. Wascher for further consideration of decompression of the subacromial space. Dr. Burg's physical examination indicated continued impingement in the left shoulder with a painful arc at about 130 degree abduction and decreased internal rotation. *Id.*

On August 26, 1998, Nuñez returned for her follow-up with Dr. Burg.  Tr. 195.  Dr. Burg examined Nuñez and found impingement with tendonitis in the left shoulder with range of motion testing reflecting abduction of 90 degrees, internal rotation of 20 degrees, and flexion of 110 degrees.  *Id*.  Because Dr. Wascher found Nuñez was not a surgical candidate, Dr. Burg assigned Nuñez an impairment rating of 15 % to the shoulder or upper extremity and opined she had reached MMI (maximum medical improvement) on that day.  Significantly, Dr. Burg noted, **"As far as her work restrictions are concerned, I would state that she should not lift over 8 pounds with the left arm, 10 pounds with the right arm and no reaching above chest height with the left arm.  These are permanent restrictions."**  *Id*.  Dr. Burg directed Nuñez to continue taking Tylenol and Flexeril and return as needed.

On January 27, 1999, Dr. Burg evaluated Nuñez for an exacerbation of her left shoulder pain.  Tr. 194.  Nuñez requested an injection for the pain.  On examination, Dr. Burg found "rather significant impingement signs in the shoulder with painful abduction at 100 degrees and painful internal rotation."  *Id*.  Dr. Burg found no neurological abnormalities.  Dr. Burg injected Nuñez' left subacromial bursa with Kenalog and procaine.  Dr. Burg also prescribed Darvocet, Flexeril, and Tylenol.

On September, 1999, Dr. Burg evaluated Nuñez.  Tr. 193.  Nuñez continued to have significant shoulder pain.  Dr. Burg noted Nuñez had "tendonitis in the supraspinatus tendon proximal to its insertion without rotator cuff seen on MRI."  *Id*.  Dr. Burg also noted weakness in the left shoulder.  Dr. Burg referred Nuñez to Dr. Wascher for consideration of an arthroscopic debridement.

On October 4, 1999, Nuñez returned to see Dr. Burg.  Tr. 192.  Nuñez continued to complain of severe left shoulder pain.  On examination, Dr. Burg noted Nuñez had difficulty raising her arm above 90 degrees.  Dr. Burg noted "Examination shows that she can get up to only 100 degrees of abduction at which point the ROM stops, not just because of pain but actual impingement."  *Id.*  Dr. Wascher had scheduled surgery for October 22, 1999.

On November 10, 1999, Nuñez returned to see Dr. Burg.  Tr. 191.  She reported not feeling any better after the surgery.  The physical examination continued to indicate limitations in shoulder ROM in an impingement pattern and cervical tenderness.  Dr. Burg referred Nuñez to Dan McClanahan for physical therapy.

On December 15, 1999, Dr. Burg evaluated Nuñez.  Tr. 190.  She reported the shoulder was finally starting to respond to physical therapy.  The physical examination revealed less impingement signs and improved ROM.  Dr. Burg prescribed ten more visits to Mr. McClanahan.  Dr. Burg prescribed Vioxx, an anti-inflammatory medication.

On January 14, 2000, Dr. Burg evaluated Nuñez.  Tr. 189.  Nuñez reported she was doing about 50 % better with physical therapy.  Dr. Burg noted she was "finally making significant progress in ROM and pain."  *Id.*   The physical examination revealed improved ROM in the shoulder, although not normal with regards to abduction and internal rotation.  Dr. Burg opined Nuñez had not reached MMI considering she was finally making progress on a regular basis and was not plateauing.  Dr. Burg recommended she continue physical therapy.

On March 24, 2000, Nuñez returned for a follow-up visit with Dr. Burg.  Tr. 188.  Dr. Wascher had evaluated Nuñez the previous day and "was quite pleased with the progress she had made to date with aggressive physical therapy with Dan McClanahan."  *Id.*  Dr. Wascher

9

recommended 2 to 2 ½ months of physical therapy.  Nuñez reported she had noticed significant improvement in her shoulder and neck pain but still required help to put on her coat.  She also reported having to cut her hair short because of the limited ROM in her left arm.  The physical examination indicated about 70 degrees of forward flexion and only 95 to 100 degrees of adduction and essentially no internal rotation behind the back.  Dr. Burg prescribed more physical therapy and Flexeril.  Dr. Burg instructed Nuñez to return in two months.

On June 5, 2000, Nuñez returned to see Dr. Burg.  Tr. 187.  Nuñez reported she was getting better and felt the physical therapy was starting to help quite a bit and wanted to continue receiving it.  Dr. Wascher had prescribed twelve more visits with Mr. McClanahan.  The physical examination revealed improved range of motion and less tenderness.  Dr. Burg deferred placing Nuñez on MMI until after her physical therapy was complete.  Dr. Burg instructed Nuñez to return in three months.

On August 28, 2000, Dr. Burg evaluated Nuñez and opined she had reached a plateau as far as her shoulder was concerned.  Tr. 186.  Dr. Burg opined:

> "She warrants 10% impairment rating to the shoulder.  She is scheduled for physical therapy with Dan McClanahan for another couple of months, which does seem to continue to help, but I really do believe that she has reached MMI.  **She is essentially on a sedentary work restriction and I don't think that she can work at her previous job, which involved taking care of disabled or elderly adults, which might involve some significant lifting, transferring, etc."**

*Id.*  The physical examination indicated good range of motion.  However, Nuñez reported pain "during abduction and internal rotation above the horizontal and behind the back, respectively."

*Id.*  **Dr. Burg placed Nuñez in a sedentary category**.

On September 6, 2000, Nuñez returned to see Dr. Burg with "continued complaints."  Tr. 185.  Dr. Burg's physical examination revealed significant improvement in range of motion, both

in terms of her shoulder and her neck.  He reiterated she had already reached MMI on her last visit and had given her a 10% impairment rating to the shoulder.

On May 30, 2001, Dr. Burg evaluated Nuñez for pressure to the left side of the neck and back.  Tr. 183.  Nuñez complained of a left-sided headache but denied numbness and tingling.  At the time, she was on Vioxx and Zanaflex.  The physical examination revealed an obvious facial asymmetry with the left side of the face being much more expressive.  Formal testing of cranial nerves III-XII revealed some weakness of the right orbicularis oculi.  The remainder of cranial nerves III-XII were intact.  There was slight weakness of the right deltoid, biceps and triceps. There was mild tenderness over the left occipital nuchal ridges and the left parietal temporal area. There was tenderness over the left coracoid, medial and superior borders of the left scapula and left 3rd, 4th 5th, and 6th ribs in the area between the scapula and the spinous  processes.  There also was tenderness over the left trapezius.  Dr. Burg assessed Nuñez with left sided headache with apparent right-sided facial and slight right upper extremity weakness.  Dr. Burg recommended an MRI of the head.

On June 18, 2001, Dr. Burg evaluated Nuñez.  Tr. 212.  She was still complaining of headaches and a painful left arm.  At this point, Nuñez' attorney had written a letter to Dr. Burg regarding her disabilities.  Dr. Burg noted the examination was unchanged.  Dr. Burg noted there was nothing else he could do for Nuñez and **reiterated that he had placed her on sedentary duty.**

On July 11, 2001, Nuñez returned to see Dr. Burg with complaints of shoulder pain and headache.  Tr. 213.  The examination showed "tenderness in the shoulders particularly anteriorly with functional range of motion."  *Id.*  Dr. Burg prescribed Effexor which he found to be helpful

11

with headaches due to musculoskeletal problems and instructed her to return in a month. Dr.

Burg also thought Nuñez "**may** have some mild depression" which Effexor would also help.

On August 16, 2001, Dr. Burg evaluated Nuñez. Tr. 214. She complained about

dizziness with tizanidine or Zanaflex and stated she did better on Flexeril. Dr. Burg opined the

headaches were "completely due to the shoulder problem" and prescribed Fioricet for the

headaches. Nuñez reported doing better on Effexor. Dr. Burg noted the Effexor was for the

depression related to all of her chronic pain from her shoulder and her neck. The physical

examination revealed the shoulder range of motion continued to improve slightly, but Nuñez still

had multiple trigger points throughout the shoulder girdle. Dr. Burg prescribed Effexor, Fioricet

and Flexeril. Dr. Burg noted he would see Nuñez as needed.

On November 29, 2001, Dr. Burg completed a Statement of Ability to do Work-Related

Physical Activities form provided by Nuñez' attorney. Tr. 215. Dr. Burg noted she could

occasionally lift and/or carry less than 10 pounds and frequently lift and/or carry less than 10

pounds. However, Dr. Burg failed to fully complete these sections of the form by not providing

an explanation for his finding that Nuñez was limited to lifting and/or carrying less than 10

pounds. Both of these sections state: "when less than one-third of the time or less than 10

pounds, underline the amount (time/pounds)." *Id.* (emphasis added). The ALJ noted in his

decision:

> Dr. Burg completed residual functional capacity forms on June 18, 2001, and November
> 29, 2001. (Ex. 87 and Ex. 10F/7). On the first form, he indicated that the claimant could
> occasionally/frequently lift and/or carry less than 10 lbs., stand and/or walk for a total of
> about 6 hours in an 8 hour day, sit for a total of less than about 4 hours in an 8 hour day,
> push and/or pull limited amounts with the upper extremities, and not perform overhead
> lifting of her [left] arm. On the second form, Dr. Burg repeated these restrictions, except
> that he indicated that she must periodically alternate sitting and standing to relieve pain or
> discomfort.

12

The form completed by Dr. Burg on June 18, 2001, and again on November 29, 2001, is not a standard form in use by the Social Security Administration, but apparently was composed by the claimant's attorney.  Under questions number 1 and 2 regarding the claimant's ability to lift and/or carry, Dr. Burg was given a choice of marking "less than 10 pounds," "20 pounds," or "50 lbs."  Dr. Burg was not given a choice of marking "10 pounds."  I believe that the wording of the form was misleading to Dr. Burg.  Dr. Burg stated in his narrative office visit reports, in which he gave his opinion freely rather than in a guided format, that the claimant could perform sedentary work, which involves lifting and/or carrying 10 lbs.

I have given controlling weight to Dr. Burg's opinion that the claimant can stand or walk for 6 hours during an 8 hour day.  However, I have not given controlling weight to Dr. Burg's restrictions regarding the claimant's ability to sit.  The claimant does not have any impairment that could reasonably be expected to affect her ability to sit, and Dr. Burg's office notes contain no evidence that she ever complained of difficulty sitting.

On a Physical Residual Functional Capacity Assessment completed on February 15, 2001, and affirmed on May 2, 2001, the state agency physicians indicated that the claimant could occasionally lift and/or carry 10 lbs., frequently lift and/or carry less than 10 lbs., stand and/or walk for a total of about 6 hours in an 8 hour workday, sit for about 6 hours in an 8 hour workday, push/pull within the restrictions for lifting and carrying, and perform limited reaching, including overhead.  (Ex. 3F).  Their opinions support the residual functional capacity finding in the present decision.

Tr. 29.  The ALJ's statement that Dr. Burg's office visits notes reflect that Dr. Burg opined Nuñez could perform sedentary work is correct and supported by the record. See Tr. 186, 212. Nuñez relies on her November 7, 1997 visit to Dr. Burg to support her argument that he found she could not lift over 10 pounds.  See Tr. 195.  However, Dr. Burg gave that opinion before Nuñez had surgery.  The ALJ also found Dr. Burg's opinion regarding Nuñez' ability to sit was inconsistent with his opinion at the time he was treating Nuñez and with his office notes which contain no evidence that she ever complained of difficulty sitting.  This finding is also supported by the record.  The ALJ set forth specific, legitimate reasons for not giving controlling weight to Dr. Burg's restrictions regarding Nuñez ability to sit.

Additionally, in support of his RFC determination, the ALJ cited to Dr. McKenzie's and Dr. Toner's evaluations and medical records. Tr. 24, 28.  The evidence indicates  that on

December 10, 1997, Dr. McKenzie, a specialist in Occupational Medicine, diagnosed Nuñez with

cervical and medical scapular strain, treated her conservatively, and released her to work with

restrictions to avoid lifting, bending, and twisting.  Tr. 151, 152.  By February 16, 1998,  three

months after the injury, Dr. McKenzie placed Nuñez in the light duty category.  Tr. 147.  Dr.

McKenzie continued to treat Nuñez until March 9, 1998, when Lovelace Occupational Medicine

closed, and her care was transferred to Dr. Eugene Toner.  Dr. Toner evaluated Nuñez on April

6, 1998, and kept her on a "10-pound weight restriction for work."  Tr. 156.  Significantly, at no

time during her visits to Drs. McKenzie and Toner, did Nuñez complain about having difficulty

sitting.  However, because the ALJ erred in conclusively relying on the Medical-Vocational

Guidelines, requiring a remand, the ALJ may seek clarification from Dr. Burg regarding Nuñez'

ability to sit and also may consider having Dr. Burg complete the proper Social Security

Administration Physical RFC Assessment form.

**B.  Mental Impairment**

Nuñez next contends the ALJ erred in finding her mental impairment was "non-severe."

Pl.'s Mem. in Supp. of Mot. to Reverse at 16.   Specifically the ALJ found:

> Although the claimant alleged at the hearing that she experiences depression and anxiety,
> she has never sought treatment from a psychologist or psychiatrist.  On July 11, 2001, Dr.
> Burg prescribed Effexor for the claimant's headaches, noting that she "may have some
> mild depression as well which the Effexor will help."  (Ex. 10F/5).  The claimant has seen
> a social worker for complaints of depression and anxiety on two occasions.  On the first
> occasion, she was sent by her attorney, and the second occasion was after admitting at the
> hearing that she had not sought treatment from a psychiatrist or psychologist.  (Ex. 12F/1
> and Ex. 13F/1).  The claimant underwent a DDS consultative psychological examination
> on January 25, 2002, by Carl P. Adams, Ph.D. (Ex. 11/F).  On mental status examination,
> her thought content was unremarkable.  (Ex.11F/1).  She denied suicidal ideation.  She did
> not present as paranoid and no delusional processes were noted.  Her stream of thought
> was within normal limits with no indications of a formal thought disorder.  Dr. Adams
> diagnosed a dysthymic disorder.  He also completed a Psychiatric-Psychological Source
> Statement of Ability to Do Work-Related Activities (Mental-MSS), on which that the

14

claimant had no mental limitations. (Ex. 11F/3-5).  Accordingly, I find that the claimant
may experience occasional feelings of depression and anxiety, but that these do not rise to
the level of a severe impairment.

Tr. 26.  Although the ALJ found Nuñez' mental impairment not severe, nonetheless, he followed

the procedure set forth in *Cruse*.  In his decision, the ALJ found:

I specifically find that the severity of the claimant's dysthymic disorder does not meet or
equal, separately or in combination, the requirements of Listing 12.04 for an affective
disorder.  With regard to the "B" criteria of the Mental Listings, the claimant has no
restriction of activities of daily living; no difficulties in maintaining social functioning; no
deficiencies of concentration, persistence or pace; and, no episodes of decompensation.

Tr. 28.  The ALJ also referred Nuñez for a consultative psychological examination with Dr. Carl

P. Adams, a clinical psychologist.  Tr. 216-221.  On January 26, 2002, Dr. Adams evaluated

Nuñez and completed a Psychological Source Statement of Ability To Do Work-Related

Activities (Mental-MSS).  Dr. Adams diagnosed Nuñez with Dysthymic Disorder.  Tr.218.  Dr.

Adams noted on the Mental-MSS form that Nuñez was **not limited** in the following areas: (1)

Understanding and remembering instructions- detailed or complex or very short and simple; (2)

Sustained concentration and task persistence- ability to carry out instructions, to attend and

concentrate, and to work without supervision; (3) Social Interactions-  ability to interact with the

public, with coworkers, and with supervisors; and (4) Adaptation- ability to adapt to changes in

workplace, ability to be aware of normal hazards and react appropriately, ability to use public

transportation or travel to unfamiliar places.  Tr. 219, 220.  Dr. Adams also noted Nuñez did not

have a problem with alcohol or other substance abuse.  Tr. 220.

On May 2, 2001, prior to the administrative hearing and Dr. Adams evaluation, Dr. Leroy

Gabaldon, a psychologist and non-examining agency consultant, completed a PRT form.  Tr. 169-

181.  Based on the evidence before him, Dr. Gabaldon found Nuñez had "no medically

determinable impairment."  Tr. 169.  To support this finding, Dr. Gabaldon noted, "Ms. Nuñez alleges some depression.  There is no formal psychiatric history, no severe cognitive limitation or ongoing thought disorder.  ADLs are intact."  Tr. 181.

It was on **April 3, 2001**, that Nuñez' attorney referred her to La Buena Vida, Inc.  A mental health care provider at La Buena Vida completed an Adult Clinical Assessment.  Tr. 222-226.  It is not clear who completed this assessment, a therapist, counselor, or social worker.  The mental health care provider noted:

> Client notes that she would like to find out if she is depressed and if her depression is the root of her being unable or not wanting to go out.  Client notes she was referred by her attorney because he identified some signs of depression and that she does not go out very often.  Her daughter also thought it was a good idea.  She wants a therapist to make her feel good again and help her go back to work.
>
> Client is unsure is (sic) she is depressed and if she is depressed, she would like to determine why.  Client is trying to identify the cause of her depression as having resulted from an attack by a DD client she was working with.  Client feels this attack is PTSD and that it is still effecting her life.  Client claims that her life is not the same as before the attack and that she remains traumatized by the attack.

Tr. 225.   The mental health care provider also noted, "Client is fearful about going out due to confrontation she has encountered from these clients.  Client states that she becomes tense and anticipatory if she goes out.  She does not go out at night, at all."  Tr. 22.  The mental health care provider's Diagnostic Report indicates the following:  Axis I:  Rule out 309.81– Posttraumatic Stress Disorder; Axis II:  Deferred; Axis III:  Released from medical care by doctor on 8-28-00 from injuries resulting from attack of (sic) during caregiving of client; Axis IV: Client was attacked while caregiving for a DD client.  Claims recurrent issues regarding attack; Axis V:  60 (GAF score).[1]   A GAF score of 60 indicates moderate difficulty in social, occupational, or school

---

[1] Global Assessment of Functioning (GAF score) is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning."   American

16

functioning (e.g., no friends, unable to keep a job).  DSM-IV-TR at 34.  The mental health care provider found Nuñez was *severely* limited in her activities of daily living, *severely* limited in her ability to maintain adequate shelter, *seriously* limited in her ability to access and/or utilize a "neutral" support system to meet her satisfaction (may include family, friends, neighbors and/or community resources), *severely* limited in her ability to satisfy her recreational/social needs and/or vocational/education objectives; and *severely* limited in her ability to satisfy her needs.  Tr. 224, 225.  The mental health provider recommended individual and women's group therapy.

Almost eight months later, at the administrative hearing, that ALJ asked Nuñez if she had "seen a psychologist or psychiatrist at all."  Tr. 66.  Nuñez replied that she had not.  *Id.*  On March 21, 2002, Nuñez' attorney wrote to the ALJ, informing him that Nuñez "had to change mental providers because she could not afford therapy sessions with La Buena Vida."  Tr. 227. The attorney also submitted additional evidence, the medical records from Rio Rancho Family Health Center dated March 15, 2002.  *Id.*

The records from Rio Rancho Family Health Center indicate that Diane Askew, a social worker therapist, completed a Behavioral Health Assessment on March 15, 2002.  Tr. 229-235. Nuñez stated to Ms. Askew that "the pain and fear of being reinjured have prevented her from reentering the workforce."  Tr. 231.  Nuñez reported having close relationships with eight close friends.  Tr. 232.  According to Nuñez, she had never been treated for psychological or emotional

---

Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed. 2000) (DSM-IV-TR).  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death.).
DSM-IV-TR at 34.

problems but had suffered serious depression, serious anxiety, and trouble understanding,

concentrating, or remembering.  Tr. 234.  Significantly, Nuñez reported:

> She awakens often with difficulty returning to sleep, nightmares three or four times per
> week about driving, walking, going out to social situations, dying, other people dying.
>
> She avoids "everything" especially people "that I don't know, people that I do know,
> because I don't want confrontation.'  She reports flashbacks to driving or being attacked
> or losing control of the car about a couple of times a week.  She believes she might have
> died when her client attacked her, and what was more unbelievable was that he was a client
> with whom she had interacted for several years with no problems.
>
> She says she is afraid to leave her home since the attack unless accompanied by her
> daughter or her "adopted" son . . . this was not the case prior to the accident in November
> 1997.

Tr. 234 (emphasis added).  Ms. Askew assessed Nuñez as "has sleep disturbances, flashbacks and

nightmares that have disrupted the overall quality of her life since a client's attack while she was

driving him in November 1997."  Tr. 235.  The ALJ considered the records from Buena Vida and

from Rio Rancho Family Health Center.  Tr. 26.  However, the ALJ adopted Dr. Adams'

evaluation and Mental-MSS form.  *Id.*   This was proper.

The ALJ generally must give more weight to a specialist about medical issues related to

his or her area of speciality than to the opinion of a source who is not a specialist.  *See* 20 C.F.R.

§416.927(d)(5).  In this case, as a clinical psychologist, Dr. Adams' opinion is entitled to more

weight than the Rio Rancho social worker therapist and the Buena Vida mental health care

provider.  Additionally, the Rio Rancho social worker therapist and the Buena Vida mental health

care provider are not considered "treating sources"under the regulations.  Thus, their opinions are

not entitled to any particular weight.  *See* 20 C.F.R. § 404.1527(2).  The Tenth Circuit has long

held that "findings of a nontreating physician based upon limited contact and examination are of

suspect reliability."  *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987).  Moreover, as the Court

18

previously noted, in determining Nuñez' mental RFC, the ALJ applied the procedure set forth in 20 C.F.R. § 404.1520a and *Cruse.*[2]

Additionally, the ALJ found Nuñez was not totally credible, a finding she does not challenge.  The Court notes that her statements to the Rio Rancho social worker therapist and the Buena Vida mental health care provider are contrary to what she reported in her December 17, 2000 Physical Daily Activities Questionnaire.  Tr. 115.  At that time, Nuñez described a typical day as: "shower, clean house, fix lunch or go out to eat with daughter, other day activities may include reading, writing, cooking, baking, gardening, also going out to a movie or a play or visit a friend."  *Id.*  Nuñez also reported the activities she participated in with relatives and friends as: "going out with friends or relatives for lunch or dinner 2-3 times week, shopping, movies, plays, card games, board games, cooking with friends, relatives 2-3 times a week."  Tr. 117.  This paints quite a different picture from the one described by Nuñez to Ms. Askew that she was afraid to leave her home since the 1997 attack by the DD client.  Nuñez made no mention of any of the symptoms she described to Ms. Askew, i.e., nightmares, flashbacks, inability to leave her home, in any of her reports to the agency or to the physicians that treated her.

## C.  Medical-Vocational Guidelines

Nuñez contends the ALJ erred in conclusively applying the grids and in failing to obtain vocational expert (VE) testimony.  Pl.'s Mem. in Supp. of Mot. to Reverse at 21.

---

[2] Nuñez also submitted a Medical Assessment of Ability to do Work-Related Activities (Mental) to the Appeals Council.  Tr. 10, 251-254.  The Medical Assessment was dated June 11, 2002, and was completed and signed by Ms. Askew and countersigned by non-examining physician Harris Smith, M.D.  The Appeals Council considered this evidence and found there was no basis for granting a review.  Tr. 8.  In evaluating the Commissioner's decision for substantial evidence, the Court considered this assessment.  *See, O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994)

Although a vocational expert should be consulted when a "claimant's residual functional capacity is diminished by both exertional and nonexertional impairments," *Hargis v. Sullivan*, 945 F.2d 1482, 1491 (10th Cir. 1991), this requirement applies only when the exertional and nonexertional impairments limit the claimant's ability to perform the full range of work within a particular exertional category, *id.* at 1490, 1492.  When an ALJ finds, based on substantial evidence, that a claimant's nonexertional impairments do not limit the range of jobs available to her, the grids may be applied conclusively.  *See, e.g., Glass v. Shalala*, 43 F.3d 1392, 1396 (10th Cir. 1994).  In his decision, the ALJ found:

> In the present case, the claimant's residual functional capacity is between sedentary and light work.  However, even if she were limited to sedentary work, then considering her age, education, and work experience, a finding of "not disabled" would be supported by application of Medical-Vocational Rules 201.21 and 201.22.  The additional limitation regarding overhead reaching has very little effect on the sedentary to light occupational base and the conclusion directed by the rules is not affected.  I find that jobs exist in significant numbers in the national economy, which the claimant is able to perform.

Tr. 33 (emphasis added).  Thus, although the ALJ accepted Dr. Burg's opinion that Nuñez was limited in her ability to do overhead reaching, nonetheless, he determined the limitation had very little effect on the sedentary to light occupational base.  Dr. Burg specifically limited Nuñez to no overhead reaching with her left arm.  Tr. 215.  Social Security Ruling 85-15, Capability to do Other Work– The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments provides in pertinent part:

> c.  Reaching, handling, fingering, and feeling require progressively finer usage of the upper extremities to perform work-related activities.  Reaching (extending the hands and arms in any direction) and handling (seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands) are activities required in almost all jobs.  Significant limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise do.  Varying degrees of limitations would have different effects, and the assistance of a VS may be needed to determine the effects of the limitations.

SSR 85-15, 1985 WL 56857, *7 (1985).  The ALJ did not explain how he arrived at his conclusion that Nuñez' limitation regarding her left arm had very little effect on the sedentary to light occupational base.  Accordingly, the Court finds that this finding is not supported by substantial evidence.  Thus, the ALJ erred in conclusively relying on the grids.  On remand the ALJ should consult with a VE.  If the ALJ seeks clarification from Dr. Burg regarding Nuñez' need to "periodically alternate sitting and standing to relieve pain or discomfort," he also may consult with the VE on this issue since this limitation, if accepted by the ALJ, also would indicate an erosion of the occupational base.  Social Security Ruling 83-12 states in pertinent part:

> 1. Alternate Sitting and Standing
>
> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing.  The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting.  Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work . . . . (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)
>
> There are some jobs in the national economy– typically professional and managerial ones– in which a person can sit or stand with a degree of choice.  If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled.  However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture  for at least a certain length of time to accomplish a certain task.  Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will.  In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base.

SSR 83-12, 1983 WL 31253, at *4.  *See also, Ragland v. Shalala*, 992 F.2d 1056, 1059 (10th Cir. 1993)(even where sit or stand option alternation is a possibility, relying on the grids for light or sedentary work is inappropriate, and the ALJ must consult a vocational expert before making a determination at step five).  Accordingly, the Court will remand this case for the limited purpose

of having the ALJ consult with a VE to determine whether Nuñez retains the RFC to perform a significant number of sedentary jobs given her limitations.  However, the Court expresses no opinion as to the extent of Nuñez' impairments, or whether she is or is not disabled within the meaning of the Social Security Act.  The Court does not require any result.  This remand simply assures that the ALJ applies the correct legal standards in reaching a decision based on the facts of the case.

A judgment in accordance with this Memorandum Opinion and Order will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**